UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LAURA A. WIRT and LAURA K.
RODRIGUEZ,

                Plaintiffs,

      -against-

UNITED STATES OF AMERICA, ANGEL
LOPEZ, and NEW YORK CITY TRANSIT
AUTHORITY,

                Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**

10-CV-5073 (PKC) (ST)

PAMELA K. CHEN, United States District Judge:

      Plaintiffs Laura A. Wirt and Laura K. Rodriguez assert claims of negligence and negligent training against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1671 ("FTCA"), and against the New York City Transit Authority ("NYCTA") and NYCTA employee Angel Lopez pursuant to New York common law, based on injuries that they allegedly incurred during a motor vehicle accident between a car owned and operated by the United States and a public bus operated by the NYCTA and driven by Lopez.  The following motions are before the Court:  (i) the United States' motion for summary judgment dismissing each of Wirt's claims, (ii) the United States' motion for summary judgment dismissing each of Rodriguez's claims, (iii) the NYCTA and Lopez's joint motion for a summary judgment finding that it has no liability to any party in the action, and (iv) Plaintiffs' cross-motion for partial summary judgment as to certain elements of their claims.  For the reasons stated below, the United States' motions for summary judgment are GRANTED, Plaintiffs' cross-motion for partial summary judgment is

DENIED, and the NYCTA and Lopez's motion for summary judgment is GRANTED in part and DENIED in part.

## I. **Background**[1]

### A. Overview

On April 23, 2008, around noon, Plaintiff Laura A. Wirt and her daughter, Plaintiff Laura K. Rodriguez, were seated next to each other on a public bus operated by the New York City Transit Authority. (Wirt 56.1 ¶ 5.) As the bus passed through Grand Army Plaza in Brooklyn, the driver, Defendant Angel Lopez, "suddenly, abruptly and without any warning" brought the bus to a halt. (Dkt. 68, Ex. A (Verified Complaint) ¶ 8.) Plaintiffs were propelled forward in their chairs, "started to get a little airborne," and then, as the bus was coming to a halt, were jolted back into their seats by the impact of another vehicle—a 2003 Oldsmobile Alero sedan owned by the United States General Services Administration ("GSA")—colliding with the rear fender of the bus. (USA's 56.1 Response (Wirt) ¶¶ 2, 5.) Both Plaintiffs experienced some degree of pain as a result of being slammed back into their seats. (Dkt. 97-3 (Rodr. Decl.) ¶ 9; Wirt 56.1 ¶ 5.)[2]

---

[1] Except as otherwise noted, the facts stated in this section are taken from the parties' Local Rule 56.1 submissions and the record evidence cited therein. (*See* Dkt. 104 (Wirt's 56.1 Statement ("Wirt 56.1")); Dkt. 105 (Rodriguez's 56.1 Statement ("Rodr. 56.1")); Dkt. 70 (United States' Response to Wirt's 56.1 Statement ("USA's 56.1 Response (Wirt)"); Dkt. 71 (United States' Response to Rodriguez's 56.1 Statement ("USA's 56.1 Response (Rodr.)").)

Where the Court cites to Wirt's or Rodriguez's Rule 56.1 Statement, it also in some instances refers, as noted, to the United States' responses thereto. (*See* Dkts. 81 (Wirt) & 82 (Rodr.).) Where a party's Rule 56.1 Statement is cited and there is no contrary evidence in the record, the Court deems that fact to be undisputed and admitted. Unless otherwise noted, a standalone citation to a 56.1 Statement denotes that the Court has deemed the underlying factual allegation undisputed. Any citation to a party's Rule 56.1 Statement incorporates by reference the documents cited therein unless otherwise noted. Where relevant, however, the Court may cite directly to the underlying document.

[2] The parties devote a substantial portion of their submissions to disputing the details of the collision between the GSA vehicle and the NYCTA bus. Given the bases for its ruling on the

After the accident, Wirt and Rodriguez sought treatment in the emergency room of the Wyckoff Heights Medical Center ("Wyckoff Heights"). (Rodr. 56.1 ¶ 10.) Both Plaintiffs reported pain in their neck, back, and shoulders resulting from the accident. (USA's 56.1 Response (Wirt) ¶ 38; USA's 56.1 Response (Rodr.) ¶ 16.) Both Plaintiffs underwent examinations and received treatment in the emergency room before being discharged. (Wirt 56.1 ¶ 12; Rodr. 56.1 ¶ 10.) Both Plaintiffs received continuing medical treatment after being discharged from Wyckoff Heights, and both Plaintiffs reported experiencing physical and mental pain and suffering in the ensuing years, as summarized in greater detail below. (Wirt 56.1 ¶¶ 24-35; Rodr. 56.1 ¶¶ 20-32.)

On July 17, 2009, Plaintiffs filed a Verified Complaint in New York state court against the NYCTA, alleging claims of negligence and negligent training under New York common law, and claims for "basic economic loss" and "first party benefits" under New York's "No-Fault" motor vehicle accident statute, N.Y. Ins. Law §§ 5101 *et seq.* (Dkt. 68, Ex. A (Verified Complaint).) While that case was still pending, in March 2010, Plaintiffs filed administrative tort claims against the GSA, alleging negligence and negligent training pursuant to the Federal Tort Claims Act ("FTCA"). (*See* Dkt. 7 ¶¶ 18, 49; Dkt. 8 ¶¶ 18, 49.) Thereafter, in November 2010, Plaintiffs commenced this action in federal court, asserting claims of negligence and negligent training

---

pending motions, *see infra*, the Court need not delve into those details at length. It suffices to note that the four eyewitnesses whose testimony is in the record—*i.e.*, Wirt, Rodriguez, the bus driver (Lopez), and the GSA driver (Horace Morancie)—gave materially different accounts of the collision, such that there are genuine issues of fact concerning the speed at which the bus was traveling through Grand Army Plaza, the swiftness with which the bus stopped, the force with which the GSA vehicle struck the bus, and the impact that all of these factors had on the passengers aboard the bus, including Plaintiffs. (*See, e.g.*, USA's 56.1 Response (Rodr.) ¶¶ 4-5, 8; Dkt. 68, Ex. A ¶ 8.) Indeed, there may even be a genuine issue as to whether Plaintiffs were on the bus at all. (USA's 56.1 Response (Rodr.) ¶ 5.) But again, the Court need not rule on these issues—which go to the substantive elements of Plaintiffs' claims—because the Court can resolve all pending motions on the independent grounds stated herein.

against the United States pursuant to the FTCA.[3]  (Dkt. 1; *see also* Dkt. 7 (Am. Compl.).)[4]  Through

their various negligence claims, Plaintiffs seek to recover non-economic damages for pain and

suffering they allegedly experienced as a result of the collision between the GSA vehicle and the

NYCTA bus on April 23, 2008.  (Dkt. 7; Dkt. 68, Ex. A.)  Indeed, as discussed below, because of

the No-Fault statutory scheme, Plaintiffs' negligence and negligent training claims, at common

law and under the FTCA as well, survive only if Plaintiffs are entitled to non-economic damages

by virtue of having suffered a "serious injury."  *See Pommells v. Perez*, 4 N.Y. 3d 566, 571 (N.Y.

2005) ("Only in the event of 'serious injury' as defined in the statute, can a person initiate suit

against the car owner or driver for damages caused by the accident.").

### B.  Plaintiff Wirt's Medical History and Alleged Injuries

The parties have submitted voluminous documentation of Plaintiff Wirt's medical history.

#### 1.  Wirt's Medical History Before the Accident

Wirt was fifty-two years old at the time of the April 23, 2008 accident.  (USA's 56.1

Response (Wirt) ¶ 14.)  For over thirty years before the accident—since Wirt was eighteen years

old—she suffered from back pain.  (*Id.* ¶ 15.)  At least as of May 2004, Wirt began receiving

medical treatment for back pain and ambulation issues.  (USA's 56.1 Response (Wirt) ¶¶ 15-16.)

In the four years leading up to the April 2008 accident, Wirt made numerous visits to medical

providers for treatment of various physical ailments, including significant impairments affecting

her neck, spine, and lower extremities.

---

[3] The FTCA does not create any substantive rights or claims; rather it permits the United
States to be sued, under certain specified circumstances, for state law causes of action, such as
negligence and negligent training.  *See Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 403
F.3d 76, 79-80 (2d Cir. 2005); *Wright v. United States*, 162 F. Supp. 3d 118, 127 (E.D.N.Y. 2016).

[4] Plaintiffs amended their complaint to properly name the United States as the only
defendant under the FTCA.  (Dkt. 7.)

In May 2004, Wirt was admitted to Wyckoff Heights for three days due to complaints of severe low back pain and difficulty ambulating. (USA's 56.1 Response (Wirt) ¶ 16.) In April 2005, Wirt underwent x-rays on her right foot and ankle ("April 2005 X-Rays"), which showed degenerative changes in her ankle joint. (*Id.* ¶ 17.) In May 2005, Wirt was admitted to Wyckoff Heights for five days due to complaints of lower back pain. (*Id.* ¶ 18.) During that stay, Wirt underwent back x-rays ("May 2005 X-Rays") that indicated a history of trauma in her upper and lower spine, the formation of bone spurs in certain vertebrae in her upper and lower spine, and a narrowing of the interarticular spaces in her lower spine. (*Id.*)

In June 2005, Wirt underwent a magnetic resonance imaging (MRI) that indicated degenerative disc disease, a small herniation in Wirt's T12 and L1 vertebrae, and marked desiccation and loss of volume in other of Wirt's vertebrae. (USA's 56.1 Response (Wirt) ¶ 19.) The report also indicated bone deformities suggestive of sickle cell anemia. (*Id.*)

In July 2005, Wirt underwent an MRI ("July 2005 MRI") that indicated spinal cord compression in certain vertebrae, abnormalities in neural signals from certain vertebrae, bone softening in certain vertebrae, and narrowing of the spinal cord in certain vertebrae. (*Id.* ¶ 21.) The radiologist who reviewed the July 2005 MRI construed the MRI as indicative of multilevel degenerative disease of the cervical spine with compression of the spinal cord, spinal narrowing, and bone softening in certain locations. (*Id.*)

In November 2005, Wirt was admitted to Wyckoff Heights for three days due to uncontrolled diabetes. (*Id.* ¶ 22.) An examination at Wyckoff Heights indicated that Wirt had a loss of sensation in her feet and that she walked with difficulty. (*Id.* ¶ 22.) Around the same time, in November 2005, Wirt was referred by a physician to consult with pain management specialists

concerning Wirt's complaints of lower back pain radiating to her legs, which Wirt said she had experienced for more than twenty years.  (*Id.* ¶ 23.)

In February 2006, a pain management physician referred Wirt to physical therapy for pain, weakness, and decreased muscle strength in her lower back, as well as residual pain and weakness in her right ankle.  (*Id.* ¶ 24.)  In April 2006, Wirt was again referred to a pain management clinic for her history of arthritis, disk herniation, and chronic back pain.  (*Id.* ¶ 25.)

In June 2006, a nurse practitioner at the pain management clinic referred Wirt to neurosurgical specialists for evaluation of her history of persistent neck pain and lower back pain.  (*Id.* ¶ 26.)  The nurse practitioner noted that the July 2005 MRI had shown compression in Wirt's spinal cord.  (*Id.*)

In July 2006, Wirt presented to the Wyckoff Heights emergency room, complaining of neck pain and lower back pain.  (*Id.* ¶ 27.)  Wirt spent four days in inpatient care, during which time her diabetes was observed as "uncontrolled."  (*Id.*)

In September 2006, Wirt was hospitalized at Wyckoff Heights due to uncontrolled high blood pressure and diabetes.  (*Id.* ¶ 28.)  Wirt also complained of neck and back pain. (*Id.*)

In January 2007, Wirt was again referred by a physician to pain management for evaluation of her degenerative disease of the cervical spine with cord compression and spinal narrowing.  (*Id.* ¶ 29.)  Later that month, based in part on a review of the July 2005 MRI, a pain management clinician referred Wirt to neurosurgery for evaluation of her history of persistent neck and lower back pain.  (*Id.*)

In March 2007, Wirt underwent an MRI ("March 2007 MRI") that indicated multilevel degenerative disease of the cervical spine, as well as spinal compression and softening.  (*Id.* ¶ 31.)  In April 2007, Wirt was seen at the Wyckoff Heights pain management clinic, where a physician

observed that Wirt was a long-time patient of the pain management clinic who had been seen for chronic pain associated with multilevel degenerative disc disease of the cervical and lumbar spine with associated spinal narrowing. (*Id.* ¶ 32.) The physician further noted that Wirt suffered neurological problems in her lower extremities due to diabetes, and that she was taking Percoset for pain relief. (*Id.*)

In August 2007, Wirt spent seven days in inpatient care at Wyckoff Heights after being referred to the emergency room there with back and neck pain and elevated blood sugar. (*Id.* ¶ 33.) The Wyckoff Heights staffperson who conducted Wirt's triage in the emergency room noted that Wirt was wearing a neck brace and ambulating with a cane. (*Id.*) During her stay in inpatient care, Wirt complained of "severe" chronic back and neck pain, and a neurosurgeon who examined her noted bilateral hand weakness, decreased ranges of motion in her neck and back, and reduced motor strength. (*Id.*) In September 2007, Wirt was hospitalized in the Jamaica Hospital Medical Center ("Jamaica Hospital") after presenting to the emergency room with uncontrolled diabetes and cellulitis with left thigh abscess. (*Id.* ¶ 34.) The triage nurse at Jamaica Hospital observed that Wirt walked with a cane, and Wirt's progress notes state that Wirt complained of neck pain while in the hospital. (*Id.*)

In October 2007, Wirt spent three days in inpatient care at Jamaica Hospital for cardiac evaluation. (*Id.* ¶ 35.) During her stay, Wirt was observed to be using a cane and wearing a soft neck collar. (*Id.*) Progress notes from the hospitalization state that Wirt complained of neck, shoulder, and back pain, and that she wore a cervical collar while hospitalized. (*Id.*)

In December 2007, a pain management clinician referred Wirt to a neurosurgeon for evaluation for possible surgery due to her complaints of severe neck pain radiating to both shoulders, as well as numbness and tingling in her upper extremities, which apparently had

worsened in the prior year.  (*Id.* ¶ 36.)  The next month, January 2008, Wirt was seen by a neurosurgeon at Wyckoff Heights, who noted that he had examined Wirt in July 2007, but that she had failed to follow through on tests that he had prescribed at that time.  (*Id.* ¶ 37.)  The neurosurgeon diagnosed Wirt with chronic neck and back pain, and instructed Wirt to return to the Wyckoff Heights neurosurgery clinic after she underwent additional testing.  (*Id.*)

As of April 23, 2008, the date of the motor vehicle accident at issue in this case, Wirt had not obtained the additional testing ordered by the Wyckoff Heights neurosurgeon in December 2007.

## 2. Wirt's Medical History After the Accident

On April 23, 2008, approximately three hours after the accident, Wirt presented to the Wyckoff Heights emergency room with complaints of pain in her neck, back, and shoulders. (USA's 56.1 Response (Wirt) ¶ 38.)  Wirt told the medical staff and clinicians at Wyckoff Heights that she had been in a motor vehicle accident.  (*Id.*)

Later in the day on April 23, 2008, Wirt underwent x-rays ("April 23, 2008 X-Rays") that showed no evidence of fracture or dislocation, but indicated moderate degeneration in Wirt's cervical spine.  (USA's 56.1 Response (Wirt) ¶ 39.)[5]  Later that day, Wirt was admitted into inpatient care in Wyckoff Heights' family medicine unit, with a status of "post-MVA" (post-motor vehicle accident) with complaints of neck, back, and leg pain but no fractures; uncontrolled diabetes; uncontrolled hypertension; asthma; and rheumatoid arthritis.  (*Id.* ¶ 40.)

On April 24, 2008, a clinician in Wyckoff Heights' family medicine unit ordered a neurosurgical consult, noting that Wirt had a past medical history of cervical and lumbar

---

[5] The April 23, 2008 X-Rays are discussed in greater detail below, in the context of analyzing expert reports submitted by the United States.

narrowing, chronic neck and back pain, and had presented to the emergency room complaining of neck, back, and leg pain after being in a motor vehicle accident. (USA's 56.1 Response (Wirt) ¶ 41.) Later that day, a neurosurgeon examined Wirt, and Wirt told the neurosurgeon that she used a walker 50% of the time and a cane daily, and that she had a history of dropping objects, frequent falls, and urinary incontinence." (*Id.* ¶ 42.) The next day, the attending neurosurgeon recommended that Wirt undergo spinal surgery, but Wirt stated that she would prefer to defer surgery at that time. (*Id.* ¶ 43.)

On April 27, 2008, a physician in the Wyckoff Heights family medicine unit recorded that Wirt's neck and back pain had resolved, and that she had no pain. (USA's 56.1 Response (Wirt) ¶ 44.) Wirt reiterated that she did not want surgical intervention at that time. (*Id.*) The next day, April 28, 2008, Wirt reported that she had "mild" neck and back pain, and the attending physician noted that Wirt could be discharged from Wyckoff Heights once she was cleared by neurosurgery. (*Id.* ¶ 45.)

On April 28, 2008, Wirt underwent an MRI ("April 28, 2008 MRI") that indicated a history of spinal narrowing and various abnormalities affecting certain of Wirt's vertebrae, but no acute injury. (*Id.* ¶ 46.)[6]

On April 29, 2008, a Wyckoff Heights physician noted that Wirt was stable and had no new neurological deficits. (USA's 56.1 Response (Wirt) ¶ 49.) The physician further noted that Wirt's pain was well controlled with Motrin and that discharge planning was in progress for when Wirt was cleared by neurosurgery. (*Id.*)

---

[6] The April 28, 2008 MRI is discussed in greater detail below, in the context of expert reports submitted by the United States.

Before she was discharged, however, Wirt changed her mind about surgery and elected to undergo surgical intervention. (*Id.* ¶ 50.) Wirt underwent the first stage of surgery on May 6, 2008, which involved surgery on her C6 and C7 vertebrae. (*Id.* ¶ 51.) Wirt underwent the second stage of surgery on May 9, 2008, which involved surgery on her C3 to C7 vertebrae. (*Id.*) As a result of the spinal surgery she received in the weeks after the accident, Wirt has permanent scarring in two places on her neck. (Wirt 56.1 ¶ 22.)

On May 14, 2008, after having spent three weeks in Wyckoff Heights inpatient care, Wirt was discharged to the Brooklyn United Methodist Church Home ("BUMCH") for rehabilitation. (USA's 56.1 Response (Wirt) ¶ 52.) Upon admission to BUMCH, Wirt reported that she had a history of urinary incontinence. (Wirt 56.1 ¶ 28 (USA's Response).) Wirt also told the consulting psychiatrists at BUMCH that she had a history of major depression and anxiety, and had been on and off Zoloft. (*Id.*) Wirt resided at BUMCH until August 15, 2008, *i.e.*, a total of three months. (*Id.*) When she left the facility, Wirt did not require any home services and she was continent. (*Id.*)

About a week after she was discharged from BUMCH, Wirt underwent an evaluation by Dr. Irving Friedman, a neurologist certified by the American Board of Neurology and Psychiatry. (Wirt 56.1 ¶ 24.) In a sworn affirmation dated August 21, 2008, Dr. Friedman recorded his observations and conclusions from the evaluation. (Dkt. 103-3 at ECF[7] 3-8.) Dr. Friedman noted that Wirt complained of severe neck pain radiating to both lower extremities, numbness of all extremities and persistent lower back pain. (*Id.* at ECF 3.) Dr. Friedman reported observing, among other things, spasms and impaired range of motion in Wirt's cervical spine,

---

[7] "ECF" refers to the pagination generated by the court's Electronic Court Filing system and not the document's internal page numbering.

diminished gripping power and tenderness in both hands, abnormalities in Wirt's gait, spasms and pain in her lower back, reduced strength and limited range of motion in her lower extremities, numbness in her upper extremities, and difficulty ambulating. (*Id.* at ECF 4-5.) Dr. Friedman also summarized the results of his review of Wirt's medical records from her inpatient treatment at Wyckoff Heights from April 23, 2008 through May 14, 2008. (*Id.* at ECF 5-7.) In conclusion, Dr. Friedman opined that, "[a]s a result of injuries sustained as a passenger on a city bus on April 23, 2008," Wirt suffered several severe "deficits" affecting her neck, back, and extremities. (*Id.* at ECF 7.) Dr. Friedman further opined that "Ms. Wirt is catastrophically disabled both emotionally and physically," and that the deficits described in his affirmation "are directly and causally related to the injuries sustained on April 23, 2008." (*Id.* at ECF 8.) With respect to Wirt's prior history of "chronic cervical and lumbar disease," Dr. Friedman opined that her condition "was dramatically aggravated and exacerbated by the events of April 23, 2008," and that, "[h]ad Ms. Wirt not been injured on April 23, 2008, she may never have required any operative procedures." (Wirt 56.1 ¶ 26.)

After her evaluation by Dr. Friedman, from August 2008 through at least September 2011, Wirt continued to receive treatment for her neck, back, extremities, diabetes, hypertension, and anxiety, among other conditions, from several different medical providers. (Dkt. 103-3 at ECF 10-12.)[8] Thereafter, on July 16, 2012, Wirt returned to Dr. Friedman for a follow-up evaluation. (Wirt 56.1 ¶ 29.) In a sworn affirmation dated July 16, 2012, Dr. Friedman described his examination of Wirt and summarized his review of certain of Wirt's medical records from August 2008 through September 2011. (Dkt. 103-3 at ECF 9-13.) Dr. Friedman reported

---

[8] Neither Wirt nor the United States argues that Wirt's treatment records during this period are relevant to the present dispute, so the Court does not discuss them in detail.

significantly impaired range of motion in Wirt's cervical spine, numbness in Wirt's extremities, and diminished strength in both hands, among other deficits. (*Id.*) In conclusion, Dr. Friedman opined that, "[a]s a result of injuries sustained while a passenger on a city bus on April 23, 2008," Wirt sustained numerous "deficits," including certain deficits related to her neck, back, shoulders, and extremities. (*Id.* at ECF 12.) In a section of his affirmation titled, "Causality," Dr. Friedman opined that "Ms. Wirt became acutely symptomatic on April 23, 2008 . . . and has become progressively so since her April 23, 2008 injuries." (*Id.* at ECF 13.) Dr. Friedman further opined that Wirt's "prognosis for further functional improvement is extremely poor," and that her "post-traumatic neuro-spinal deficits are permanent in nature and causally related." (*Id.*)

Thereafter, Wirt obtained three additional follow-up evaluations from Dr. Friedman. For each of these evaluations, Dr. Friedman prepared a sworn affirmation, and Wirt has attached all five of Dr. Friedman's affirmations as exhibits with her summary judgment papers. (Wirt 56.1 ¶¶ 29-35.) Much like his first two affirmations, Dr. Friedman's final three affirmations, dated July 11, 2013, October 24, 2014, and September 1, 2015, summarize his physical examinations of Wirt and his review of Wirt's medical records generated since his last affirmation. (Dkt. 103-3 at ECF 15-30.) In each of the affirmations, Dr. Friedman concludes that Wirt suffers from numerous severe deficits in her neck, back, shoulders, and extremities "as a result of injuries sustained while a passenger on a city bus on April 23, 2008." (*Id.* at ECF 17 (July 11, 2013 Affirmation), ECF 23 (October 24, 2014 Affirmation), ECF 29 (September 1, 2015 Affirmation).)

There is, however, one glaring omission from all of Dr. Friedman's affirmations. Although each of the affirmations concludes that Wirt's severe physical and mental deficits were the "result of injuries sustained while a passenger on a city bus on April 23, 2008," none of the

affirmations contains an explanation of how Dr. Friedman reached that conclusion. (*See* Dkt. 103-3.)  Indeed, underscoring this omission, although the affirmations show that Dr. Friedman reviewed Wirt's post-accident medical records from Wyckoff Heights (*see* Dkt. 103-3 (August 21, 2008 Affirmation) at ECF 5-8), and her subsequent medical records from August 2008 through roughly September 2015 (*see* Dkt. 103-3 at ECF 10-12, 23, 27-28), none of Dr. Friedman's affirmations contains any summary or analysis of Wirt's extensive medical history prior to the accident (*see* Dkt. 103-3).  Wirt does not direct the Court to anything in the record indicating the basis for Dr. Friedman's conclusion that Wirt's physical and mental deficits were caused by the April 23, 2008 accident, as opposed to her pre-existing medical conditions.  Nor does Wirt direct the Court to any evidence that Dr. Friedman reviewed any of Wirt's pre-accident medical records prior to reaching the conclusions expressed in his affirmations.

For its part, the United States has submitted a sworn affirmation, dated, June 15, 2014, setting forth the medical opinion of Dr. Devon A. Klein, M.D., a licensed physician who is board certified in Diagnostic Radiology.  (Mahoney Decl., Ex. F (filed under seal).)  Dr. Klein reviewed Wirt's medical imaging records from May 2005 (x-ray and CT images), June 2005 (MRI images), July 2005 (MRI images), March 2007 (MRI images), April 2008 (x-ray and MRI images), and May 2008 (CT images).  (*Id.*)  Dr. Klein found that the records showed the "hallmarks of chronic degenerative disease" in Wirt's spine, and that the degenerative disease "precedes the [accident]."  (*Id.* at 4.)  Dr. Klein found that Wirt's post-accident MRI images were very similar to her pre-accident MRI images.  (USA's 56.1 Response (Wirt) ¶ 56.)  Dr. Klein found that Wirt's medical imaging after the accident was consistent with the chronic degenerative disease from which Wirt suffered years before the accident.  (*Id.* at 3-4.)  Dr. Klein

also found that none of Wirt's medical images suggested any acute injury as a result of the April 2008 accident.  (*Id.* at 3-9; *see also* USA's 56.1 Response (Wirt) ¶¶ 44-46.)[9]

### C. Plaintiff Rodriguez's Medical History and Alleged Injuries

At the time of the April 23, 2008 accident, Plaintiff Rodriguez was nineteen years old. (USA's 56.1 Response (Rodr.) ¶ 14.)  Neither party argues that Rodriguez's pre-accident medical history is relevant to this case.

On the day of the accident, Rodriguez was examined in the emergency room of Wyckoff Heights.  (Rodr. 56.1 ¶ 10.)  Rodriguez expressed tenderness in her neck with lateral movement, but had full range of motion and neurological function.  (USA's 56.1 Response (Rodr.) ¶ 16.)  Rodriguez's ultimate diagnosis at Wyckoff Heights was a cervical sprain.  (*Id.*) Rodriguez was instructed to take an over-the-counter anti-inflammatory drug, return to Wyckoff Heights if her condition worsened, and follow up with her primary medical doctor as needed.  (*Id.*)  Rodriguez was discharged about an hour after she arrived at the emergency room.  (*Id.*)

One week after the accident, on April 30, 2016, Rodriguez was examined by Panagiotis Zenetos, M.D., a doctor affiliated with Wyckoff Heights.  (Rodr. 56.1 ¶ 12.)[10]  Dr. Zenetos noted

---

[9] The United States also submitted a sworn affirmation, dated September 22, 2014, by Dr. Firas M. Chamas, M.D., a licensed physician who is board certified in Orthopedic Surgery-Spine.  (Mahoney Decl., Ex. G.)  Dr. Chamas affirms that he reviewed Wirt's medical records and diagnostic images from June 2005 through May 2008.  (*Id.*)  But Dr. Chamas's affirmation does not reach any definitive conclusion as to whether Ms. Wirt's medical condition was materially affected by the April 2008 motor vehicle accident, deferring instead to the conclusions of Ms. Wirt's treating physicians and other doctors who reviewed Ms. Wirt's medical files.  (*Id.*) Dr. Chamas's affirmation thus adds nothing of significance to the Court's analysis of Wirt's medical history.

[10] The United States disputes whether Rodriguez was examined by Dr. Zenetos one week after the accident, (USA's 56.1 Response (Rodr.) ¶ 12), noting, among other things, that Rodriguez stated twice in her deposition that she did not see a doctor or seek any treatment after leaving the

Rodriguez's reports of pain in her neck, back, right thigh, hip, and shoulders. (*Id.*) He also noted that Rodriguez expressed pain and tenderness associated with certain movements of his legs and torso. (*Id.*) Dr. Zenetos prescribed two medications for pain relief. (*Id.*)

Nearly two months after the accident, on June 23, 2008, Rodriguez was examined by Dr. Woo Tak of Staten Island Rehabilitation Medicine, P.C. (USA's Response 56.1 (Rodr.) ¶ 18.) Rodriguez reported that she did not have any radiating pain, weakness or numbness in her extremities. (*Id.*) Dr. Tak diagnosed Rodriguez with neck and back pain with no neurologic deficit, and prescribed physical therapy, a home exercise program, and an anti-inflammatory drug. (*Id.*) Over the next two months, Rodriguez underwent physical therapy and occasional follow-up appointments with Dr. Tak, during which she expressed neck and back pain. (Rodr. 56.1 ¶ 13.)

On July 17, 2008, Rodriguez sought a neurological and medical assessment from Dr. Friedman, the same physician who evaluated Plaintiff Wirt and who has submitted sworn affirmations on Wirt's behalf. (Rodr. 56.1 ¶ 16.) Dr. Friedman recorded Rodriguez's complaints of pain in her back and shoulders, observed significantly reduced range of motion in Rodriguez's neck, back, and shoulders, and spasms in her cervical region. (*Id.* ¶¶ 16-17.) Dr. Friedman concluded that, as a result of injuries "sustained as a passenger on a city bus on April 23, 2008," Rodriguez was suffering from numerous acute conditions causing pain, spasms, and reduced range of motion in her neck, back, and shoulders. (*Id.* ¶ 18.) Dr. Friedman concluded that "Ms. Rodriguez remains with a total and painful and multi-level disability at this time." (*Id.*)

---

emergency room on April 23, 2008 until nearly two months later. (USA's Response 56.1 (Rodr.) ¶ 18.) Finding it plausible that Rodriguez simply failed to recall her visit to Dr. Zenetos when she sat for a deposition nearly four years later, the Court declines the United States' request to disregard what appear to be Dr. Zenetos's notes of his examination of Rodriguez on April 30, 2008. (*See* Dkt. 99-2 at ECF 5.)

Four days later, on July 21, 2008, Dr. Sanford Wert, M.D., an orthopedic surgeon, conducted an independent medical examination of Rodriguez on behalf of the NYCTA. (USA's 56.1 Response (Rodr.) ¶ 19.) Dr. Wert observed that Rodriguez had normal gait, was independent in ambulation, was able to mount and dismount the examining table without difficulty, and was able to walk on her heels and her toes. (*Id.*) On examination of Rodriguez's neck and back, Dr. Wert found no evidence of palpable tenderness or muscle spasm, although there was some deficit in Rodriguez's range of motion. (*Id.* ¶ 20.) On examination of Rodriguez's shoulders, Dr. Wert found no tenderness to deep palpitation and normal range of motion. (*Id.* ¶ 21.) On examination of Rodriguez's lumbosacral spine, Dr. Wert found no evidence of palpable tenderness or muscle spasm and normal range of motion. (*Id.* ¶ 22.) Based on his examination, Dr. Wert diagnosed Rodriguez with a resolved sprain or strain of the cervical spine, a resolved sprain or strain of the lumbar spine, and a resolved sprain or strain of the bilateral shoulders. (*Id.* ¶ 24.) Dr. Wert also gave a favorable prognosis: "Prognosis is good. Based on clinical evaluation, it is my impression that there is no accident related orthopedic disability." (*Id.*)

After completing her physical therapy sometime in the fall of 2008, Rodriguez did not seek medical treatment for her neck, back, shoulders, or extremities for nearly five years. (*Id.* ¶ 27.)[11] On December 11, 2012, in connection with this lawsuit, Jonathan S. Garay, D.O., conducted an independent physical medicine and rehabilitation evaluation of Rodriguez. (*Id.* ¶ 30.) Rodriguez stated that she was independent in all activities of daily living and caring for her three-year-old child, and that she was working as a cashier at a convenience store. (*Id.*) Dr. Garay's examination

---

[11] Rodriguez argues that she "did resume her care and treatment" and, as evidence of that, points to medical records documenting treatment that Rodriguez received in the years after 2008. (USA's Response 56.1 (Rodr.) ¶ 27.) But none of the cited records contradict the fact that Rodriguez did not seek medical treatment for her neck, back, shoulders, or extremities for nearly five years. (*Id.*)

of Rodriguez's neck, back, lower extremities, upper extremities, spine, and shoulders revealed normal and pain-free range of motion, and no significant abnormalities. (*Id.* ¶¶ 30-35.) Ultimately, Dr. Garay diagnosed Rodriguez with resolved cervical strain/sprain and resolved thoracolumbar strain/sprain. (*Id.* ¶ 36.) Dr. Garay opined that Rodriguez had long since recovered from any cervical and thoracolumbar strains/sprains without any residua, and that there was no reason to restrict her activities. (*Id.*) Dr. Garay concluded that Rodriguez had no impairment related to the April 23, 2008 motor vehicle accident. (*Id.*)

On July 11, 2013, more than five years after the accident, Rodriguez underwent a second evaluation by Dr. Friedman. (Rodr. 56.1 ¶ 20.) Dr. Friedman noted Rodriguez's complaints of "daily spasms in the neck" and "migraines." (*Id.* ¶ 20.) Dr. Friedman also observed reduced range of motion in Rodriguez's neck and back. (*Id.* ¶ 21.) Dr. Friedman concluded that as a result of injuries "sustained as a passenger on a city bus on April 23, 2008," Rodriguez suffered from several chronic, post-traumatic "deficits" affecting her neck and spine, as well as recurring migraine headaches, anxiety, and depression. (*Id.* ¶ 22.)[12] Dr. Friedman did not explain how he determined that the "deficits" he observed were caused by injuries that Rodriguez had sustained in a motor vehicle accident on April 23, 2008, and there is no evidence that Friedman considered other possible causes of the observed deficits that may have occurred in the five years since he last examined Rodriguez. (*Id.* ¶ 22; Dkt. 102-1 at ECF 10-12.)[13]

---

[12] Notably, many of the "deficits" that Dr. Friedman reported in his July 11, 2013 report were not listed as deficits in his July 11, 2008, and he gives no explanation for the discrepancy.

[13] Rodriguez underwent a third evaluation by Dr. Friedman on September 1, 2015, more than seven years after the accident, and after discovery had closed in this case. (Rodr. 56.1 ¶¶ 28-32.) Dr. Freidman's report of that examination was materially the same as his July 11, 2013 evaluation, including its omission of any explanation of how he determined that the "deficits" he observed were caused by injuries that Rodriguez sustained in a motor vehicle accident on April 23, 2008. (Dkt. 102-1 at ECF 3-7.)

From 2011 to 2015, Rodriguez also received treatment from her primary care physician, Dr. Tauqeer Ahmad. (Rodr. 56.1 ¶¶ 24-25.) Rodriguez asserts that her visits to Dr. Ahmad, as documented in her medical chart, (Dkt. 103-1), support her allegations of a significant and lasting physical impairment resulting from the April 2008 accident. (Rodr. 56.1 ¶¶ 24-25.) Although the medical records in question document several visits by Rodriguez to Dr. Ahmad, the records do not indicate that Rodriguez received any treatment from Dr. Ahmad for her neck, back, shoulders, or extremities until June 2, 2015, more than seven years after the accident and nearly five years into this litigation. (*Id.* ¶ 25.) Rodriguez points to no evidence in Dr. Ahmad's records of any connection between the April 2008 accident and the neck and back symptoms for which Rodriguez received treatment starting in June 2, 2015, let alone any explanation of the basis for drawing such a causal connection. (*Id.*)

## II. Legal Standard

Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006). "To grant the motion, the court must determine that there is no genuine issue of material fact to be tried." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). A genuine factual issue exists where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), or by a factual argument based on "conjecture or surmise," *Bryant v.*

*Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "[What] is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968). "Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir. 1997).

## III. Analysis

Defendant the United States moves for summary judgment on all claims that Plaintiffs assert against it: (i) Wirt's claim of negligence under the FTCA; (ii) Wirt's claim of negligent training under the FTCA; (iii) Rodriguez's claim of negligence under the FTCA; and (iv) Rodriguez's claim of negligent training under the FTCA.

Defendant the NYCTA likewise moves for summary judgment on the tort claims that Plaintiffs assert against it: (i) Plaintiff Wirt's claim of negligence; (ii) Plaintiff Wirt's claim of negligent training; (iii) Plaintiff Rodriguez's claim of negligence; and (iv) Plaintiff Rodriguez's claim of negligent training.[14] As previously noted, whether Plaintiffs can sufficiently demonstrate "serious injury" is a potentially dispositive issue with respect to their claims against both parties. *See Pommells v. Perez*, 4 N.Y. 3d 566, 571 (N.Y. 2005).

---

[14] The Court notes that neither the submissions by Plaintiffs nor those by the NYCTA expressly identify the claims on which the NYCTA is seeking summary judgment. Nonetheless, the parties' legal and factual submissions make reasonably clear that the NYCTA is seeking summary judgment dismissing the negligence and negligent-supervision claims that Plaintiffs asserted in their Verified Complaint (Dkt. 68, Ex. A, ¶¶ 1-26, 39-65). The Court has evaluated the NYCTA's motion based on this understanding.

## A.  The "Serious Injury" Requirement Applies in This Case

Article 51 of New York State's No-Fault Insurance Law ("N.Y. Ins. Law") provides that in a personal injury or negligence action between "covered persons," "there shall be no right of recovery for non-economic loss, [*e.g.,* pain and suffering,] except in the case of a serious injury, or for basic economic loss."  N.Y. Ins. Law §§ 5104(a), 5102(c).

The statute defines a "covered person" as, *inter alia*, "any owner, operator, or occupant of . . . a motor vehicle which has in effect the financial security required by [other sections of the law], . . . . or any other person entitled to first party benefits."  N.Y. Ins. Law § 5102(j).  "First party benefits," in turn, are defined as "payments to reimburse a person for basic economic loss on account of personal injury arising out of the use or operation of a motor vehicle."  *Id.* § 5102(b).

The Second Circuit has squarely held that the United States is entitled to first party benefits under the No-Fault statute.  *See United States v. Gov't Emps. Ins. Co.*, 605 F.2d 669, 671 (1979).  As a person entitled to first party benefits, the United States is a "covered person" under the statute.  *See* N.Y. Ins. Law. § 5102(j); *Patrello v. United States*, 757 F. Supp. 216, 220 (S.D.N.Y. 1991) ("It is clear that the United States is a covered person under the no-fault law," either as an "owner" of an insured vehicle, or as a "person entitled to first party benefits." (citing *United States v. Gov't Emps. Ins. Co.*, 605 F. 2d at 671)).[15]  Furthermore, Plaintiffs do not dispute that the NYCTA is

---

[15] Plaintiffs cite one case, *Cooper v. United States*, 635 F. Supp. 1169 (S.D.N.Y. 1986), in support of their argument that the United States is not a "covered person" within the meaning of the No-Fault statue.  But *Cooper* is inapposite.  In *Cooper*, the court considered whether a pedestrian who was struck by a United States postal vehicle was a "covered person" under New York's No-Fault statute, where the pedestrian was unable to recover first party benefits because the only motorized vehicle involved in the accident was owned and operated by the United States, which is immune from paying first party benefits by virtue of its sovereign immunity.  635 F. Supp. at 1172-73.  The court held that the pedestrian need not show "serious injury" to sustain its tort claim against the United States because that limitation—*i.e.*, the requirement of showing a "serious injury" to recover other damages—was designed to apply only where the injured person was entitled to receive "prompt and full compensation for economic losses up to $50,000," which the

likewise a "covered person" under the statute. Accordingly, to prevail on their claims of negligence against either the United States or the NYCTA, each Plaintiff must show that she suffered from a "serious injury," as defined in the statute, as a result of the defendant's negligence. *See, e.g.*, *Mesimeris v. United States*, 2006 WL 148911, at *7 (E.D.N.Y. Jan. 17, 2006) (dismissing negligence claim where plaintiff failed to demonstrate "serious injury" flowing from alleged negligence, as required by No-Fault statute), *aff'd*, 215 F. App'x 42 (2d Cir. 2007).

The No-Fault statute defines "serious injury" as follows:

> a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment

N.Y. Ins. Law § 5102(d).

## B.  Neither Plaintiff Has Shown That the Accident Caused Serious Injury

### 1.  Plaintiff Wirt

Wirt argues that she satisfies the "serious injury" requirement because (i) she was prevented from performing substantially all of her normal daily activities for more than ninety days while she was "confined" in Wyckoff Heights and the BUMCH, and (ii) she sustained a

---

pedestrian in that case was not. *Id.* at 1172 (quoting *Montgomery v. Daniels*, 340 N.E.2d 444, 452 (N.Y. 1975)).  Here, by contrast, Plaintiffs do not allege or create any issue of fact as to whether they were entitled to receive first party benefits from the NYCTA as a result of the accident. *See* N.Y. Ins. Law § 5103(a)(1).  As such, even assuming the *Cooper* court's reasoning is correct as a matter of law, it does not extend to the facts of this case.

"significant disfigurement" in the form of post-surgical scarring on her neck. (Pls.' Br. 23-24.) In response, the United States argues that Wirt has failed to show the requisite causal connection between the April 2008 accident and her supposed "serious injuries." The United States argues principally that, even assuming Wirt's post-surgical scarring or post-surgery "confinement" at BUMCH qualifies as a "serious injury" under the statute, neither of those alleged injuries was "proximately caused" by the April 2008 accident. (USA's Opp'n Br. (Dkt. 80) 16-23.)

Under New York law, where a defendant moves for summary judgment on the ground that a collision did not cause "serious injury" within the meaning of the No-Fault statute, the defendant has the initial burden to submit "persuasive evidence" that the plaintiff's alleged pain and injuries were not caused by the collision. *Pommells v. Perez*, 4 N.Y.3d 566, 580 (N.Y. 2005). In particular, where a defendant argues that a plaintiff's injuries were caused by pre-existing conditions, "a defendant must submit adequate medical evidence supporting that contention." *Cross v. Lambombard*, 9 N.Y.S.3d 416, 415 (App. Div. 2015). If the defendant meets its burden, the burden shifts to the plaintiff to "come forward with evidence addressing the defendant's claimed lack of causation." *See Arenes v. Mercedes Benz Credit Corp.*, 2006 WL 1517756, at *8 (E.D.N.Y. June 1, 2006) (citing *Pommells,* 4 N.Y.3d at 580). A plaintiff cannot defeat summary judgment if her submission consists of expert opinion that fails to adequately address plaintiff's pre-existing conditions. *See Pommells*, 4 N.Y.3d at 574-75 (finding dismissal of plaintiff's complaint proper when plaintiff's expert opined that his symptoms were "causally related to the history as stated," which included both the accident and plaintiff's kidney surgery, but "left wholly unanswered the question whether the claimed symptoms diagnosed" were caused by the accident). If the plaintiff

fails to provide such evidence, the defendant is entitled to summary judgment. *See Arenes*, 2006 WL 1517756, at *8; *Pommells*, 4 N.Y.3d at 580.[16]

With respect to Plaintiff Wirt, the Court finds that the United States has submitted "persuasive evidence" that Wirt did not suffer a "serious injury" as a result of the April 2008 accident. As explained in detail above, Wirt had a long history of medical problems affecting her neck, back, shoulders, and extremities that long pre-dated the April 2008 accident. *See supra.* Between 2005 and April 2008, Wirt was hospitalized at least seven times for testing and treatment associated with chronic pain and reduced functioning of her neck and back, as well as uncontrolled diabetes. *Id.* Wirt was also referred for surgical consultations on multiple occasions. *Id.*

In addition, the United States' medical expert, Dr. Klein, a licensed physician who is board certified in Diagnostic Radiology, reviewed Wirt's medical imaging records from before and after the accident, and concluded that Wirt presented with the "hallmarks of chronic degenerative disease" of the spine that "precedes the [accident]." (Mahoney Decl., Ex. F, at 4.) Dr. Klein further found that Wirt's post-accident MRI images were very similar to her pre-accident MRI images, that none of Wirt's medical images suggested any acute injury as a result of the April 2008 accident, and that Wirt's medical imaging after the accident was consistent with the chronic degenerative disease from which Wirt suffered years before the accident. (*Id.* at 3-4.) The Court finds that this evidence is indeed "persuasive evidence" that the plaintiff's alleged pain and injuries were related to a pre-existing condition. *See Evans v. United States*, 978 F. Supp. 2d 148, 167 (E.D.N.Y. 2013) (finding that plaintiff's pre-existing injuries in the same body part several

---

[16] Ultimately, if both parties have met their respective burdens, the Court may grant summary judgment for the defendant only if the record allows the Court to find, as a matter of law, that the pre-existing condition was the sole cause of the plaintiff's injury. *See Perl v. Meher*, 18 N.Y.3d 208, 219, 960 N.E.2d 424 (N.Y. 2011).

years before the accident persuasive enough to shift the burden to plaintiff); *Arenes*, 2006 WL 1517756, at *8 (finding defendant's expert's report sufficient to shift the burden where it stated that plaintiff's injuries were not consistent with an acute, traumatic event but, rather consistent with pre-existing and degenerative conditions).

In response to the United States' submissions, Wirt has submitted five sworn affirmations from Dr. Friedman, a neurologist certified by the American Board of Neurology and Psychiatry. (*Id.* ¶ 24.) Wirt argues that Dr. Friedman's affirmations are not only sufficient to preclude summary judgment for the United States, but also provide a basis on which to grant summary judgment for Wirt on the "serious injury" issue. (Pls.' Br. 22-24.) The Court disagrees.

Although Dr. Friedman has opined that Wirt suffered numerous deficits "[a]s a result of injuries sustained as a passenger on a city bus on April 23, 2008," Dr. Friedman has utterly failed to explain the basis for that conclusion, notwithstanding the multiple reports he generated containing this conclusion that have been submitted in this action. Indeed, underscoring this omission, although the affirmations show that Dr. Friedman reviewed Wirt's post-accident medical records from Wyckoff Heights (*see* Dkt. 103-3 (August 21, 2008 Affirmation) at ECF 5-8), and her subsequent medical records from August 2008 through roughly September 2015 (*see* Dkt. 103-3 at ECF 10-12, 23, 27-28), none of Dr. Friedman's affirmations contains any summary or analysis of Wirt's extensive medical history prior to the accident on April 23, 2008 (*see* Dkt. 103-3). It is as if it never existed. Wirt does not direct the Court to anything in the record indicating the basis for Dr. Friedman's conclusion that Wirt's physical and mental deficits were caused by the April 23, 2008 accident, as opposed to her pre-existing medical conditions, nor does Wirt direct the Court to any evidence that Dr. Friedman reviewed any of Wirt's pre-accident medical records prior to reaching the conclusions expressed in his affirmations.

The law is clear that, without such an explanation, Dr. Friedman's affirmations fail to rebut the United States' persuasive evidence that Wirt's serious medical conditions were caused by her pre-existing conditions. *See Arenes*, 2006 WL 1517756, at *8 (applying *Pommells v. Perez*, 4 N.Y.3d 566 (2005), and finding that plaintiffs failed to submit evidence sufficient to demonstrate a triable issue of fact when a medical report by plaintiffs' doctor failed to explicitly address defendants' experts' finding that injuries were caused by a pre-existing, degenerative condition); *Pommells,* 4 N.Y.3d at 580 (finding dismissal of plaintiff's complaint proper when plaintiff's expert opined that his symptoms were "causally related to the history as stated," which included both the accident and plaintiff's kidney surgery, but "left wholly unanswered the question whether the claimed symptoms diagnosed" were caused by the accident).[17]

Furthermore, to the extent Wirt argues that the spinal surgeries she underwent in May 2008 were necessitated by the accident, that claim is not supported by Dr. Friedman's reports and is contradicted by Wirt's own medical records, which document more than on pre-accident referral for surgery—that Wirt failed to follow-up on—including one just four months before the accident. (USA's 56.1 Response (Wirt) ¶ 37.)

Accordingly, the Court holds that Wirt has failed to rebut the United States' evidence that her medical condition, surgeries, and post-surgery treatment in April 2008 and thereafter were the

---

[17] *See also Marcellus v. Forvarp*, 956 N.Y.S.2d 13 (App. Div. 2012) (finding that plaintiff failed to raise a triable issue of fact, despite having submitted medical evidence regarding her recent physical limitations and MRI findings, because plaintiff's experts did not address a previous medical report relating to a prior accident noting plaintiff's worsening pain); *Bravo v. Martinez*, 963 N.Y.S.2d 82 (App. Div. 2013) (affirming summary judgment for defendants where plaintiff had pre-existing injuries resulting from multiple prior car accidents and plaintiff's expert's report failed to adequately differentiate between injury after the previous accident and injury after the subject accident).

result of her per-existing medical conditions. The Court therefore grants Defendants' motions for summary judgment as to Wirt on the issue of "serious injury."

### 2. Plaintiff Rodriguez

As discussed, neither party argues that Plaintiff Rodriguez's medical history prior to the date of the accident, April 23, 2008, is relevant to this case. And the parties agree, at least for summary judgment purposes, that Rodriguez received medical evaluations and treatment for alleged injuries to her neck and back in the months and years after the April 2008 accident. The parties dispute, however, whether any of these injuries constitutes a "serious injury" within the meaning of the No-Fault statute, and, if so, whether that injury was proximately caused by the April 2008 accident.

In her legal arguments, Rodriguez does not specify the precise type of "serious injury" she suffered as a result of the April 2008 accident. (*See* Dkts. 106 & 109.) From her Rule 56.1 Statement, the Court gathers that Rodriguez is asserting a "serious injury" in the form of prolonged pain, spasms, and decreased range of motion in her neck, back, and extremities, as well as chronic anxiety and migraine headaches. (Rodr. 56.1 ¶¶ 28-32.)

Rodriguez's assertion of a "serious injury" is flawed in three respects. First, temporary pain and soft-tissue injury that does not result in a permanent restriction of mobility is not a "serious injury" under the statute. *See Scheer v. Koubek*, 70 N.Y.2d 678, 679 (N.Y. 1987); *Yanez v. City of N.Y.*, 29 F. Supp. 2d 100, 115 (E.D.N.Y. 1998). Thus, evidence that Rodriguez experienced some tenderness and decreased range of motion in the three months after the accident is not sufficient to show a "serious injury" under the statute. *See ibid.*

Second, Rodriguez has failed to adequately explain the cessation in her treatment for the injuries allegedly suffered in the April 2008 accident. The record shows that Rodriguez received

anti-inflammatory drugs, pain killers, and a prescription of physical therapy in the three months after the accident. It appears, however, that Rodriguez then received no examinations or treatment for her alleged injuries in the ensuing five years. "While a cessation of treatment is not dispositive—the law surely does not require a record of needless treatment in order to survive summary judgment— a plaintiff who terminates therapeutic measures following the accident, while claiming 'serious injury,' must offer some reasonable explanation for having done so." *Pommels v. Perez*, 830 N.E.2d 278, 283 (2005). Here, Rodriguez asserts that she ceased her treatment not because her injuries had been resolved, but because she became pregnant and "preoccupied with her daughter." (USA's 56.1 Response (Rodr.) ¶ 27.) But this explanation does not hold up under scrutiny: the record shows that, between her first visit to Dr. Friedman in July 2008 and her first follow-up appointment in July 2013, Rodriguez visited her primary care physician numerous times for ailments unrelated to her alleged injuries from the April 2008 accident. (USA's Response 56.1 (Rodr.) ¶ 27.) Furthermore, in an independent physical examination on December 11, 2012, Rodriguez reported that she was independent in all activities of daily living and caring for her three-year-old child. (*Id.* ¶ 30.) The December 2012 examination also indicated that Rodriguez had normal and pain-free range of motion in her neck, back, lower extremities, upper extremities, spine, and shoulders, with no significant abnormalities. (*Id.* ¶¶ 30-35.)

Third, the sworn affirmations submitted on Rodriguez's behalf by Dr. Friedman—which are dated July 11, 2013, and September 1, 2015—fail to establish a causal connection between the April 2008 accident and any physical or mental impairment that Rodriguez was suffering in July 2013 or September 2015. Although Dr. Friedman opines that Rodriguez suffers from several "deficits," including "daily spasms in the neck" and "migraines," he provides no explanation for his conclusion that these deficits were a result of injuries Rodriguez "sustained as a passenger on

a city bus on April 23, 2008." Indeed, in these affirmations there is no evidence that Friedman considered other possible causes of the observed deficits that may have occurred in the five years since he first examined Rodriguez. (*Id.* ¶ 22; Dkt. 102-1 at ECF 10-12.)

Moreover, as the United States observed in its reply brief (USA Reply Br. (Rodr.) 6), Rodriguez did not offer any argument in her legal memorandum that she suffered a "serious injury." Instead, Rodriguez argued solely that the "serious injury" requirement does not apply because the United States is not a "covered person" under the No-Fault statute. (Dkts. 106 & 109.) Indeed, Rodriguez's only response to the United States' arguments as to "serious injury" comes in the "Conclusion" section of Plaintiffs' brief, where they assert in conclusory fashion that "Rodriguez . . . presents multiple material questions of fact, precluding summary judgment even under the 'serious injury' requirement." (Dkt. 106 at 25.) Thus, Rodriguez appears to have conceded this argument in any event.

For these reasons, the Court grants Defendants' motion for summary judgment as to Rodriguez on the issue of "serious injury."

### C. The Parties' Liability Arguments

Aside from the "serious injury" requirement, the parties have submitted briefing on the merits of Plaintiffs' negligence claims. Plaintiffs argue that they are entitled to partial summary judgment as to liability against the United States because the GSA driver negligently slammed into the NYCTA bus. (Pls.' Br. (Dkt. 106) 13-15.) The NYCTA and Lopez argue that they are entitled to summary judgment as to liability against the United States on the same ground. (Dkt. 118.) The United States opposes both motions, arguing that issues of fact exist as to whether the GSA driver was negligent, and, if so, whether his negligence was the proximate cause of any injury to Plaintiffs. (Dkts. 80 & 84.)

As noted above, *supra* n.2, the four eyewitnesses whose testimony is in the record—*i.e.*, Wirt, Rodriguez, the bus driver (Lopez), and the GSA driver (Horace Morancie)—gave materially

different accounts of the collision, such that there appear to be genuine issues of fact concerning the speed at which the bus was traveling through Grand Army Plaza, the swiftness with which the bus stopped, the force with which the GSA vehicle struck the bus, and the impact that all of these factors had on the passengers aboard the bus, including Plaintiffs. (*See, e.g.*, USA's 56.1 Response (Rodr.) ¶¶ 4-5, 8; Dkt. 68, Ex. A ¶ 8.) There may even be a genuine issue as to whether Plaintiffs were on the bus at all. (USA's 56.1 Response (Rodr.) ¶ 5.) These factual disputes would likely preclude summary judgment as to liability.

Nonetheless, the Court need not rule on the liability issue. The Court is granting summary judgment to Defendants based on Plaintiffs' failure to establish a "serious injury" resulting from the April 2008 accident. The parties' arguments as to liability are therefore moot. *See, e.g.*, *Nicholas v. Cablevision Sys. Corp.*, 984 N.Y.S. 2d 332, 334 (App. Div. 2014) ("Given the absence of serious injury, the issue of liability is academic."); *Arenes*, 2006 WL 1517556, at *9 (similar). Accordingly, the Court denies Plaintiffs' motion for partial summary judgment as to liability and the NYCTA and Lopez's motion for summary judgment as to liability.

## IV. Conclusion

For the foregoing reasons, the United States' motions for summary judgment are GRANTED, Plaintiffs' cross-motion for partial summary judgment is DENIED, and the NYCTA and Lopez's motion for summary judgment is GRANTED in part and DENIED in part.


SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2017
        Brooklyn, New York